## Case No. 8,622.

### LYLE et al. v. The CONESTOGA.

[8 Leg. Int. 21, 154; 5 Pa. Law J. Rep. 95.]

District Court, E. D. Pennsylvania. Jan. 3, 1851.[1]

COLLISION—PROBABILITY OF TESTIMONY—CONFLICT OF TESTIMONY.

[1. Where, in a collision between a steam tug and a schooner, the testimony is in direct conflict, the court will, after examining all the circumstances, give its decision with the side whose testimony is the most reasonable.]

[2. A collision occurs between a steam tug and a schooner, and the latter is sunk. There is a direct conflict in testimony between the parties, each accusing the other of being wholly at fault. An examination of the injury done to the defendant steam tug by the collision shows that the tale as told by the witnesses for the defendant is the most probable. Upon this state of facts the court decides for the defendant.]

In admiralty.

R. Rundle Smith, for libellants.

R. P. Kane and H. Wharton, for respondents.

KANE, District Judge. On the 19th of October last, a little before five o'clock in the morning, the schooner Margaret, a small river or canal boat, proceeding down the river, with a cargo of lime, destined for Hook creek, a small estuary above Marcus Hook, when about three hundred yards above its mouth, came into collision with the steamer

[1] [Reversed in Case No. 8,622a.]

Conestoga, a heavily laden steam tug, coming up to Philadelphia, and sunk almost immediately. The wind was from the N. W., blowing fresh; and the tide ebb about two-thirds spent. The libel, which is sworn to by the captain of the schooner, asserts that she was kept as close to the Pennsylvania side of the channel as it was safe to do; that he and his crew made every effort to avoid the collision, that they hailed the steamer repeatedly and audibly to keep clear, as she was seen "coming towards" the schooner; but that the steamer held her course, and took no notice of their outcries either before or after the injury. The answer, sworn to by the charterers of the Conestoga, imputes all the blame to the mismanagement of the schooner, and claims damages against her. It avers that the steamer was heading N. E. by E. for the town of Chester, and moving nearly parallel with the Pennsylvania shore, and at about 100 yards from it; that the schooner, when first seen, was about 300 yards off, heading directly down the river, and at such a distance to leeward, that if she had kept her course, she would have passed about twenty yards clear of the steamer; but that when she had approached within a very short distance, or about one-half of the steamer's length off, she suddenly luffed right across the steamer's bows, and although the steamer was instantly stopped, yet the force of the tide brought the larboard side of the schooner against the bow of the steamer with such violence as to produce the injury to both vessels. In answer to the allegation that they paid no attention to the outcries of the schooner's crew after the accident, it avers that the officers of the steamer did not suppose the schooner had been seriously damaged, and that their own vessel was so much injured as to urge them to hasten onward to have her repaired.

On the pleadings, it is apparent that the ruling question is, as to the positions of the two vessels, and the courses they were steering before the encounter. If the schooner, passing down the river with a favorable tide and the wind abeam, was so far to leeward of the steamer, that by keeping on her course she would have passed clear of her, then she was bound to keep on, and had no right to throw herself across the steamer's bows. If, on the other hand, the two vessels were "coming towards" each other on a right line, or nearly so, then it was the duty of each to port her helm; and the steamer in that case having the open river before her, and the schooner having the shore close to her starboard, the steamer is answerable for not having given way. The evidence on this question of direction and course is directly conflicting. Rhinehart, who was at the schooner's helm, says: "The steamer was about 300 yards from us when we first saw her. The schooner was going down the river; the steamer heading right across the river, at, as near as could be, heading from the Jersey

to the Pennsylvania shore. She did not alter her course after I hailed her. We did not change our helm at all after we saw her, I could not luff away closer to the shore; we were too near it; and I was afraid to put her helm out, or keep her away, for fear of running into the boat, as she was heading towards us." He says again: "When we first saw the steamer, she was heading for the Pennsylvania shore; she was about 300 yards from us when we first hailed her." Evans, one of the hands of the schooner, says: "I suppose we were within two or three hundred yards from the creek when the steamer ran across the river, and headed us off. Capt. Lyle and Mr. Rhinehart both hailed her when she came within hailing distance; but she did not alter her course or diminish her speed in consequence of the hailing." "The schooner was laying her course for the creek when the steamer struck her, close to the shore, as near the course as she could possibly run." Again he says: "When I first saw the steamer she was heading right at us." Wood, the other of the schooner's crew, was below at the time of the collision, and the captain's account of it, somewhat meagre of details, and therefore unsatisfactory, is embodied in his libel, as I have already recited it. This is all the direct evidence in support of the libellant's case. If it be true, the act of the steamer was most wanton and unjustifiable, and that of the schooner altogether blameless. The steamer, according to it, came across the river from the Jersey to the Pennsylvania side, heading a strong wind, and encountering the adverse tide where it was strongest, merely to strike against the schooner. For she could have had no other object; and had she failed in attaining this, she must have gone aground by her own impetus, for the schooner was as close to the channel edge as it was safe for her to be, and the steamer had the greater draught of water. Nor is this all. Sharp, another witness for the libellants, was on board a vessel at Marcus Hook piers when the Conestoga came by, and he says she pressed so close to him that he was afraid she would strike his vessel. We must suppose the steamer then to have crossed towards the Jersey shore after this, and to have returned, breasting the tide twice in the same half mile, and within some 20 or 30 minutes, if Rhinehart and Evans are to be relied on. The first direct witness on the part of the respondent is Edward Robinson, the pilot of the steamer. He says he took the helm immediately after passing Marcus Hook, and when the steamer was about a length from the pier; that he kept close under the windward or Pennsylvania shore, parallel with it, and as close in as he could with safety; "our object in keeping so far to windward," he says, "being to get a slack tide to stem against in coming up, being heavily laden, and the boat being very slow at the best of time." When about half

or three-quarters of a mile above Marcus Hook, he saw the schooner ahead about 300 yards off, heading directly down the river, and about 20 yards to leeward. She continued to keep that course, he says, until the two vessels were about the length of the steamer from each other, when a voice from on board her called out "Keep way," or "Keep off," and immediately afterward she luffed up, or rounded to cross the steamer's bows. He says, that at the word "Keep off," he starboarded his wheel for an instant, although he thought it unnecessary, yet intending to give the schooner more room to pass, as he supposed the man on board the schooner was frightened by the two vessels passing so near each other; but observing immediately afterwards that the schooner was coming across his bows, he stopped his engine, and put his helm hard a port. Captain Tuft, who acted as mate of the steamer, and had left the helm and gone below after passing Marcus Hook, testifies that when he left the deck she was heading for Chester piers, very close in, out of the tide. Being deeply laden, he says, "we run her in, in order to get her ahead some; she could hardly hold her own against the current. If she had been in the main ship channel, she couldn't have held her own; I suppose our speed was about three knots, if it was that." Hearing the halloo, he hurried on deck, and found the steamer heading as before, and the schooner athwart her bows, heading square in for the Pennsylvania shore; the two vessels just about to be foul of each other. Riley, the engineer on duty, of course, did not see the collision, and cannot testify as to the direction of the two vessels or their distance. So far as his testimony goes, it negatives the assertion that the steamer was coming across the river. The only other person on board the steamer who witnessed the circumstances is Walter, one of the deck hands. He was on the after part of the deck at the time of the halloo, and going forward "saw a schooner just rounding to across the steamer's bows." He cannot tell exactly how far she was off, but thinks about the length of the schooner. "The steamer," he says, "was heading about as fair for Chester piers as we could make it out, about 100 yards from shore, and the schooner about 20 yards outside the steamer. The schooner, when we got forward, was heading for shore right across the river; she appeared as though she had had a straight course down the river, and had turned right round; her sails were all to the eastward." The schooner, he repeats, was coming down the river, and she luffed, and shot across towards the Pennsylvania shore.

This is, I believe, a summary of the direct evidences on both sides; and I confess the account given by those on board the steamer strikes me as much the more probable of the two. It consists with the objects which both vessels had in view. The steamer, struggling

to make headway against the tide, and with the wind from the northwest, would naturally keep close under the shore, where the tide is always less rapid, and where the wind would retard her least. The schooner, bound down the river, would keep the tideway and wind full, till she was nearly opposite her place of destination, and would then luff up to reach it. The other story supposes that the schooner was willing to forego the benefit of the favoring tide by keeping outside the channel, and that the steamer was desirous of encountering it where it was most adverse, and making tacks back and forth across the river as if she was under sails. The only error according to both respondents' statement was that the schooner changed her direction when she found she was too close to the steamer; according to the libellants the schooner's course was unseamanlike, and the steamer's absurd. But there is a fact in the case which relieves us from the necessity of weighing probabilities. It is the character of the injury which the steamer received in the collision. About this there is no dispute; and it proves conclusively that the part of the steamer which first came in contact with the schooner was the starboard side of her stem. Now, this could not have happened by any possibility on any version of the libellants' story, for there can be no doubt that the steamer was coming up the river, and not going down. Coming up the river, as the libellant says she was, or crossing the tide on her way up, as the witnesses for the libellants affirm, it would have been her larboard side, and not her starboard, which must have branted the collision. And, on the other hand, the injury. which the steamer would receive from a collision such as the respondents describe, would be exactly such as was found on the steamer's bows,—the schooner, luffing suddenly from the tideway towards the Pennsylvania shore, would impinge first on the steamer's starboard bow. Indeed there is no other possible theory of the collision. but that asserted by the respondents, which is not fatally inconsistent with this unquestioned fact, that the force or resistance which did the injury to the stem of the Conestoga, the body against which she impinged, or which she impinged against her, was on her starboard bow. This, of course, decides the case against the libellants.

The course taken in the argument, and the somewhat varying opinions which were expressed by the experts who were examined, respecting the rules of river navigation, make it proper for me to say, that this court adopts without limitation what it supposes to be the rules of the English Trinity House. I recite them succinctly here, for the information of those who are engaged in navigating our coast and river. If two sailing vessels are approaching each other in such a manner, that they may probably come together if both hold their course: then, 1. If both are going free, or with the wind abeam, both are to port the helm, so as to pass larboard side to larboard. 2. If both are going closehauled, or by the wind, the vessel on the larboard tack is to bear away, so as to pass larboard side to larboard. 3. If one is going with the wind fair, and the other closehauled, or by the wind, the vessel having the wind fair is to give way, and the vessel going closehauled is to keep her wind. Steamers are regarded as sailing vessels that have the wind free; therefore, 4. When a steamer is approaching a sailing vessel going closehauled or by the wind, in such a manner as to hazard a collision between them, the steamer is to give way, and the vessel going closehauled is to keep her wind. 5. When two steamers, or a steamer and a sailing vessel, with the wind free, are approaching each other in such a manner as to hazard a collision, both are to port the helm so as to pass larboard side to larboard. These five rules, it will be remarked, apply to those cases only, in which the two vessels are approaching each other in such a manner that they may come together if both hold their course. In other cases, the rule which has been practically sanctioned by the courts of admiralty and which the present case illustrates, may be expressed thus: 6. Where two steamers or two sailing vessels with the wind free, or a sail vessel with the wind free and a steamer are approaching each other, but in such a manner that by each keeping her course they will go clear of each other, neither is to change her course when near the other without necessity, unless it be to increase the distance between them. I do not wish to be understood as deciding beforehand that these rules admit of no exceptions. There doubtless are such, that refer themselves to the direction and force of tides, the depth of channel way, and the draught of vessels, and the intricacies that sometimes embarrass the navigation of a crowded thoroughfare. But the exceptions are few; and the circumstances must be very nearly imperative, to exclude a particular case from the operation of the general rules. In decreeing for the respondent in the case immediately before me, I feel reluctant to award damages against the libellants. I believe they did not intend to do any wrong, but that they probably were ignorant of the rule of navigation. and lost their self-possession as they found themselves approaching the steamer. They have suffered heavily in the loss of their vessel. If a precedent can be found for such a course, I shall dismiss the respondents' claim for damages. At present I dismiss the libel with costs; and will hear from the counsel of the parties before I go farther. Decree accordingly.

[NOTE. On appeal to the circuit court, the learned judge, after examining the testimony in the case very carefully, reached the conclusion that the steamboat Conestoga was in fault. The decision of the district court was reversed, and decree entered for libellants. Case No. 8,622a.]